## ADAMS V. SCHIFFER ET AL.

1. A misrepresentation goes for nothing unless it is a proximate and immediate cause of the transaction. It is not enough that it may have remotely or indirectly contributed to the transaction, or may have supplied a motive to the other party to enter into it. The representation must be the very ground on which the transaction has taken place.

2. A fraud must relate to the facts then existing, or which had previously existed; hence non-performance of a promise made in the course of negotiations is not of itself either a fraud or the evidence of fraud.

3. Where a party has possession or control of the property of another, and refuses to surrender it to the control and use of the owner, except upon compliance with an unlawful demand, a contract made or money paid by the owner under such circumstances to emancipate the property is to be regarded as made under compulsion.

4. Money deposited with a banker by a customer in the ordinary way is money lent to the bank, with the superadded obligation that it is to be paid when demanded by check.

*Error to District Court of Rio Grande County.*

ADAMS, the plaintiff in error, filed his bill of complaint in the court below against Schiffer, Forsch and Stern, praying for an account, and a reconveyance to him of the Aztec lode and the Aztec mill-site, and, in case he should not be entitled to this relief, that the defendants be decreed to pay him certain sums of money. The cause was tried to the court on the bill, answer and evidence, and the bill dismissed. From this decree Adams appeals to the supreme court. It appears from the evidence that

the plaintiff in error, Adams, on the 24th day of January, 1881, entered into a contract to sell to the defendant Schiffer an undivided one-half interest in certain mining and milling property, viz., the Summit lode and the Summit mill-site, situate in Summit mining district, in Rio Grande county, with the engine, stamp-mill and machinery thereon. The consideration was $3,500,— $1,500 cash in hand, the remaining $2,000 to be paid when, in the language of the contract, "said Adams shall execute and deliver to said Schiffer good and sufficient deed of conveyance, passing to said Schiffer a good and sufficient title to the above-described property." It was further agreed "that at any time when, by mutual consent, the whole of said property shall have been sold for the sum of $40,000, or the interest of said Schiffer in said property shall have been sold for the sum of $20,000, the said Schiffer will immediately pay to the said Adams the sum of $6,000." Schiffer further agreed "to furnish the sum of $5,000 as working capital for the working and developing of the aforesaid property; said amount to be furnished as needed for the working and developing of said property; * * * and it is agreed that the said $5,000 shall be repaid to said Schiffer out of any proceeds arising in any way from said property." It was further agreed "that, should it be advisable for said Adams to relocate the lode or mining claim and mill-site heretofore described and known as the 'Summit Lode,' and 'Summit Mill-site,' and to change the name of said lode from its present name, 'Summit Lode,' to that of ' Aztec Lode,' and to change the name of the said mill-site from its present name, 'Summit Mill-site,' to that of the ' Aztec Mill-site,' then all of the aforementioned agreements by each of the parties hereto in relation to the said Summit lode and Summit mill-site shall apply with equal and full force and effect to the Aztec lode and Aztec mill-site, when the same shall have been located." In selling and purchasing, the respective parties had in view placing the

property on the New York market, and selling it at an advance. The complainant, Adams, addressed himself at once to the relocation and entry of the lode and mill-site under the name of the "Aztec Lode" and "Aztec Mill-site." The entry under that name was made by him on or about the 15th of the following June. In the meantime both Adams and Schiffer went to New York city,, and, in the month of March following the sale, Adams sold to one Ferdinand Forsch, a brother-in-law of Schiffer, a one-eighth interest in his remaining interest in the mining and milling property for the sum of $2,500; $250 was paid down, and the remaining $2,250 was to be paid, in the language of the agreement, "on or before the 1st day of June, 1881, or as soon thereafter as a perfect title deed can be given said party of the first part; said party of the first part binds himself, or his heirs, assigns or administrators, to give said party of the second part a good warranty deed, as soon as a duplicate receipt for patent is issued from the United States land office at Del Norte, for the within described mine and mill-site." Both parties returned from New York to Del Norte; and, on the 15th of June, Adams having theretofore entered the property under the name of the "Aztec Lode and Mill-site," conveyed to Schiffer by deed of quitclaim the one-half interest in pursuance of his agreement of the 24th of January, at which time Schiffer paid to Adams the remainder of the purchase money, $2,000. Adams also, at the same time, tendered to Schiffer, as the representative of Forsch, a deed for the one-eighth interest theretofore sold to Forsch in March. At this point the first difference arose. When Adams tendered the Forsch deed to Schiffer the latter refused to receive it, and to pay Adams on behalf of Forsch the remainder of the purchase money, $2,250. He claimed that Adams had made certain false and fraudulent representations respecting the amount of ore on the dump at the time Forsch purchased. Adams denied making any such representations. Schiffer offered

to receive the deed for Forsch, and to pay $1,750, saying that this was the best he would do. Adams finally accepted the proposition, took the money and delivered the deed. In respect to this, as well as the other contentions in this case, the parties are practically the only witnesses. Of this settlement on the 15th of June the plaintiff, Adams, testifies: "Mr. Schiffer had gone up to the mine, and came down and said to me that I had made representations of the mine to him and his brother-in-law. I said I had not done any such thing. He said, 'You made representations, but the condition is not as you represented it to be; you said there was at least one thousand five hundred pounds to a ton somewhere there, but it is not there.' I said, 'What has become of it?' He said he did not know; it was not there. I asked him if he thought I was responsible for that. 'I cannot help it,' he says; 'it is not there, and I do not propose to pay you the other $2,250.' I said, 'I could not stand that. I am ready, whenever I can get my money, to make this deed.' He said, 'I will pay you $1,750, and no more, and I think I will probably buy this back myself from Mr. Forsch.' Understanding that I had done as I had agreed to do, I trusted to getting the other $500 from Mr. Forsch, and gave him the deed. This conversation occurred in Mr. Schiffer's store, in the main building. * * * I took the ore that I carried to New York as specimens out of the same place, and Mr. Schiffer and I both went to see Bullback in New York. There was fifty-eight pounds of dry ore. Mr. Bullback's certificate was $1,467, and, I think, some cents. * * * Mr. John Shaw told me there was one thousand five hundred pounds on the dump. I made the statement through him. I left the mine on the 16th day of January previous, I think. This ore was taken out afterwards. I informed Mr. Schiffer of the ore taken out, as a fact stated by Mr. Shaw. The ore was sampled before the sale to Mr. Forsch. * * * I wanted the money, and he wouldn't pay more, and I took it rather than lose the sale."

The defendant Schiffer testifies that " Mr. Adams told him (Forsch) it was a good piece of property in his opinion; told him there was some money taken out last year; and, judging from the ores which he had sent to me, it was a valuable piece of property. I received fifty-eight pounds of ore which I assayed at Bullback's, and it ran $1,400; that is, the ore that he testified about, sent in the spring. Mr. Adams told Mr. Forsch there was several tons of good ore on the dump. Mr. Forsch said, 'If that is the case, what will you take for an interest — for one-sixteenth.' Mr. Adams wanted $5,000; Forsch would not give it; * * * but finally an agreement was drawn up that he was to pay Adams $250 down and $2,250 when Mr. Adams gave him the deed; that was the sum of the contract. We both considered that there was not much risk, as there were several tons of good ore on the dump. When we went up to the mine I do not believe we found fifty pounds of ore; * * * there was a vein there, but not very valuable ore; that was at the Colconda; but he represented that there was several tons of very rich ore. Mr. Adams came to Del Norte a few days later,— about the 14th or 15th of June. We had the receiver's receipt of the Aztec lode. The deeds were brought over the next day, and we went to Jim Ross' office to acknowledge them, and we had my deed acknowledged. I told Mr. Adams that I would not take the Forsch deed; that, under the circumstances, I could not accept it, as Mr. Forsch had requested me to attend to his business for him. I said, at the recorder's office, 'We will consider that you own one-half and I own one-half, and that the deed to Forsch was not accepted by me.' * * * I told Adams I would not accept the Forsch deed, and would rather let the $250 go than take the property, as it is entirely different from what you represented it to be in New York. Mr. Adams insisted upon it, but I would not do it. I told him I would telegraph to Mr. Forsch about it, and then I could tell him

what I could do. I telegraphed that I thought $2,000 should be paid, and no more; and if Mr. Adams would be satisfied with that I would wire him. Mr. Adams said to wire him and see what he says. It was accepted. Mr. Adams acknowledged the deed, and I paid him $1,750. He made the draft on Mr. Forsch, and I cashed it. Mr. Adams was perfectly satisfied. I acted for Mr. Forsch because he was my brother-in-law, and he told me to act for him. The receipt given me is the one read in evidence." With respect to this transaction Adams claims that he is entitled to a decree for $500, the remainder of the purchase money as agreed upon.

On the 18th day of October following, Adams entered into an agreement with Schiffer to convey to him by good and sufficient deed his remaining interest in the said Aztec lode and mill-site for the sum of $25,000, to be deposited to the credit of Adams in the Rio Grande County Bank on or before the 15th day of November, 1881. Schiffer was in New York, and soon thereafter telegraphed to Adams to come for the purpose of closing a sale of the property. In response to the telegram Adams went east, and on the 17th of November sold and conveyed, by quitclaim deed, his remaining interest in the property to one Stern for the sum of $15,500. This sale to Stern was negotiated by Schiffer, who represented to Adams that this was all he could get for the property. Adams was reluctant to sell the property for that price. The purchase money, $15,500, was paid by Stern to Schiffer, who, before paying it over to Adams, insisted that Adams should repay to Schiffer his share, or seven-sixteenths of the money advanced by Schiffer for the purpose of working and developing the mine, amounting to about $6,800. Adams expressed his willingness to pay his share of all moneys so advanced by Schiffer for working and developing the mine, over and above the sum of $5,000, but insisted that, under the written agreement of January 24th, that Schiffer was to advance

$5,000 for the developing and working of the mine, and was to be reimbursed out of the proceeds arising from working the mine.   Schiffer, on the other hand, insisted that he was, under the terms of the contract, to be re-imbursed his $5,000 out of the proceeds of the mine, whether arising from working the mine or from its sale. Adams finally yielded to the claim of Schiffer, delivered the deed, and received from Schiffer the purchase money, $15,500, less the amount claimed by Schiffer as due from Adams to him for money laid out and expended by Schiffer in working and developing the mine.   This was the second matter of difficulty, in respect to which the complainant Adams claims a decree for the sum of $2,900.   Of this settlement the complainant Adams tes-tifies:  "He said, 'if you will take the $15,500,' he would make the negotiations.   Well, I had to do that or noth-ing.   I made the conveyance for $15,500, on this under-standing of what I have been telling; I did not know who this man was.   I have got up to the point where I finally concluded to tell him to make out the deed.   He did so, and wanted the deed made out to another man, and he wanted the consideration in the deed $45,000.   I said, 'You can put it in $50,000 if you want it; and if you have to pay it it will not be so pleasant.'   Well, I had not got any money yet; but we had figured up this thing,— what I owed him on the expenses for work. When he came to pay me he said, I am going to take out what you owe me.   This deed was signed, and I could not help it.   I thought I had better let him have it. I took his check for $12,000 on his bank, and he paid me the balance.   He took out the balance I owed him on the tunnel transaction, and paid me the balance in cur-rency."    On cross-examination he says:   "He said a friend of his would give $15,000 for it.   I refused, and then he wanted a settlement, and then it was discovered I owed seven-sixteenths of the amount expended in de-velopment, and he used that as a means of coercion.   I

preferred, if I could, to settle amicably. He would have taken security on what I had if I would have given it to him. If he had given me the $15,500 for that interest, without taking his pay out, I would not have been satisfied to sell; not for that price. I considered that I might be placed in a worse position by Schiffer if I did not do as I did. I did not know he could not compel me to pay the seven-sixteenths of the development money; he said he could compel me. I knew the contract said he was only to be paid that $5,000 from the mine, and that I had received no proceeds from the mine. I offered Mr. Schiffer security on the ore taken out, and him to give me twenty-five per cent. for my share until he was paid; but he wouldn't do it. I wanted him to do that and go on and ship the ore, but he would not do that; but he would have taken a deed for my interest and held it, · and when he got the deed I would have been completely in his control. He didn't tell me he would freeze me out. On the whole of this, rather than chance what I feared, I sold balance for $15,500. [Witness here shows Exhibit L.] I made, executed and delivered that instrument." The defendant Schiffer testifies: " My contract with him was that this $5,000 or more, whatever I advanced towards developing this property, I could only get through the sale of the mine, or from sales of ore. I I did not press him at all for the money; made no such demand for his share of the development money. * * * The $5,000 development was to come out of a sale of the mine or proceeds of the ore; either a sale of all or only a portion of the mine,— either way; presume that was Dr. Adams' understanding also. Every fraction sold was to pay its proportion of the development money. When Dr. Adams sold seven-sixteenths to Stern, it was my understanding that seven-sixteenths of all development money was to be paid by Adams to me, and deducted from the proceeds of the sale. When he sold the one-sixteenth to Forsch I didn't deduct the development

money, because he didn't have the money to spare at that time, and I didn't ask him for it. We had no expenses then, in June, to speak of. *Question.* Now, I will call your attention to this part of the contract, ' And it is agreed that the said sum of $5,000 shall be repaid to said Schiffer out of any proceeds arising in any way from said property.' Do you swear that that meant that the proceeds arising in any way from said property meant from the sale of the property? *Answer.* Yes, sir."

In March, 1882, Richard O. Adams, a son of the complainant, set up a claim of title to the property sold by his father, and entered a protest at the proper office, restraining the officer against issuing of patent to his father for said property. The complainant had at the time about $8,000 deposited at the Rio Grande County Bank, an incorporation owned and controlled by the defendant Schiffer and his brother, one Abraham Schiffer. The defendant Schiffer refused to honor the checks of the complainant on said deposit until the claim of his son to the property should be adjudicated and settled. Schiffer professed his willingness to pay $10,000 to have the matter settled, and the complainant opened up negotiations with his son, who resided a part of the time in Utah and part of the time in Denver. After extended negotiations, running through several months, the son, Richard O. Adams, executed a deed to Schiffer, conveying all his right, title and interest in and to the property, and received from Schiffer, through the First National Bank of Denver, the sum of $10,000. The deed of the son appears to have been delivered to Schiffer. Schiffer then insisted that Adams should reimburse him the $10,000 paid to the son in order to protect the title. With respect to this there was more or less contention. Schiffer finally, however, offered that if Adams would release his claim to the contract of January 24 for $6,000, to be paid in case the mine should be sold for $40,000, or Schiffer's half interest for $20,000, and allow Schiffer, in addition,

$2,500 cash, that he would settle upon that basis and none other; that if he would not accede to that proposition, Adams would have to enforce his rights in the courts. Adams took time to consider, returned to the bank in the afternoon, and accepted Schiffer's proposition. Thereupon receipts in full, covering all the transactions with respect to the mining property, were signed and interchanged by the parties. The refusal of Schiffer to pay the complainant his money upon his check until the complainant should secure a deed from his son, and the subsequent refusal of Schiffer, after obtaining possession of the deed of the son, to settle with complainant upon any other basis than the one which we have set forth, constitutes the third ground of complaint, in respect to which the complainant claims that he is entitled to a decree for the sum of $10,000. It was admitted that on or about the 15th day of June, 1881, the proceedings being apparently regular, the proper officials of the land office at Del Norte issued to Dr. Adams a receiver's receipt, and that some time in the early part of 1882 a protest, or document of some kind having that effect, was filed in the general land office at Washington against the issuing of a patent to Dr. Adams, and that, in consequence of the filing of such papers, an order was made directing the local land office at Del Norte to institute a hearing as to the matters set up in the protest and report the result thereof to the general land office at Washington. Respecting the relocation of the mining property and his son's claim of title the complainant testifies: "We relocated it as abandoned property in February or March, 1881. I think it was subject to relocation for failure to do assessment work in 1879. Did some work that year, but think not enough. Don't recollect whether I made affidavit to that effect. Mr. Schiffer had an abstract. Don't know whether it showed title in my son; some said it did. I know all about conveying the mine to my son in June, 1873. Told Schiffer I had a right to relocate

it. Don't believe I told him the work had not been done for more than one year. I told him the mine was abandoned by my son. Perhaps I told him the necessary work had not been done for at least one year, and for that reason it was abandoned and subject to relocation, and that I would relocate it as the Aztec lode and get a clear title. * * * I did not see my son about revoking the power of attorney he gave me. I did not write to him about it in January, 1882, or at any time. I don't know when the deed signed by myself as attorney in fact for my son was written, but I know I signed something like this in New York city; but I knew nothing about the power of attorney being revoked. * * * That deed was made by Schiffer and sent to me to sign with and under the knowledge that my son had revoked the power of attorney; and he urged me to sign it, and I suppose I had the right to do it. This deed was sent me by letter. That is the letter [Exhibit F 3], dated January 22, 1882. * * * "

Defendant Schiffer testifies: "It was about the middle of January, 1881, when I heard that young Adams had a claim. I didn't mention anything about his claim when I sent the deed to New York to be signed by Dr. Adams, for himself and for his son, as his attorney in fact. I didn't know what trouble he would make; didn't know from the abstract made in 1881 that the son had a title. * * * I don't remember how long I had the abstract referred to before the conversation with Dr. Adams. I wanted to see the title I was buying. I got the abstract two or three days before our agreement. Before the execution of the contract in January, 1881, I told Dr. Adams that the deed to his son and wife, and especially to his wife, were ridiculous. I knew all about the title before I signed the contract with Dr. Adams. He agreed to relocate the property if he found it necessary. *Question.* Was it the understanding, Mr. Schiffer, that the doctor should purchase and perfect a title, and

make a relocation of this property, if it were advisable, under a different name, and that such name should be the 'Aztec Mine and Mill-site;' that when he got a patent in consequence of that application, and had made a deed to you, that that should be a compliance with this contract? *Answer.* I should consider it such; yes, sir."

Messrs. HUGH BUTLER, T. D. W. YONLEY and FRANK NAYLOR, for plaintiff in error.

Messrs. MARKHAM, PATTERSON and THOMAS, for defendant in error.

ELBERT, J. The complainant, Adams, prays for an account, and for a reconveyance of the Aztec mine and Aztec mill-site. We consider first the case made on the pleadings and evidence against the defendant Schiffer. The complainant alleges that he was the owner of the mining property in question; that it was of great value; that the defendant Schiffer knew this, and desired to purchase an interest in it; that the complainant was embarrassed financially, and unable to work the mine advantageously; that the "defendant was possessed of considerable money and property, and claimed to have a considerable acquaintance and influence among moneyed men in the city of New York; that if he could acquire an undivided one-half interest in the property he would assist in opening and developing the property, and in that manner greatly enhance and increase the value of the remaining half of the property retained by the complainant; that by the aid and influence of the defendant among his moneyed friends and acquaintances in New York, after said property had been opened and developed, he could sell the remaining half interest in said property, or some portion thereof, for a very large sum of money, so that the complainant could in a short time realize a fortune in ready money by the sale thereof;" that the plaintiff, believing and relying upon said representations,

made with the said Schiffer the contract of sale of January 24, 1881. With respect to this contract of sale there is no allegation of fraudulent representations. The only allegation which we find in the bill is in the fourteenth paragraph, and is one of fraudulent intent, namely, that the defendant *"entered into said contract with the intent to deceive and defraud plaintiff."* The theory upon which plaintiff seeks to recover is thus more fully stated by his counsel: "The primary purpose is made plain by the after-conduct of the defendant Schiffer. That he has oppressed, coerced and impoverished plaintiff at every turn throughout the whole transaction, after his purchase of one-half interest, cannot be denied; and from this conduct the inference appears to us to be irresistible that the defendant Schiffer made the original purchase of the half interest for the purpose of getting a hold upon the property, and enabling himself to practice the wrongs and oppressions which he has practiced upon the plaintiff. From this, and what Schiffer did in the end, the conclusion cannot be escaped that he made the promise to use his influence with his friends to sell plaintiff's remaining interest, and to pay plaintiff the $6,000, with the fraudulent intent not to keep the one, or to perform the other; with the purpose not to carry out the arrangement, but to make use of the situation, which he would gain through the arrangement, to get the title to the property in the end, in exact accordance with what he has shown by the evidence to have accomplished through coercion, intimidation and duress." The defendant Schiffer's representations as to his influence in New York, and his ability to sell, were general. He did not undertake to sell at any sum, much less for any definite sum. He engaged to expend a certain sum in developing the mine; this he did. His demand for reimbursement will be hereafter considered. It does not appear that his representations respecting his influence were false, or that he failed to make the promised effort to sell. He did effect a sale

of the remaining interest of the complainant at figures which the complainant voluntarily accepted, although the price did not meet his expectations.   There is no evidence that Schiffer could have sold the property for a larger sum, or that he did not make due effort to that end.  Had his representations, however, been false, and had he failed to effect a sale, it would not have necessarily been a ground for the relief asked.  "A misrepresentation goes for nothing unless it is a proximate and immediate cause of the transaction.   It is not enough that it may have remotely or indirectly contributed to the transaction, or may have supplied a motive to the other party to enter into it.   The representation must be the very ground on which the transaction has taken place." Kerr, Fraud & M. 84; *Improvement Co. v. Cowan,* 5 Colo. 324. While Schiffer's representations as to his influence in making the sale may have been a motive influencing the complainant in making the contract of January 24, it cannot be said, in view of the conflicting testimony, that it definitely formed a part of the consideration, or that it was the proximate and immediate cause of the transaction.   The distinct allegation of the bill, however, is that in entering into this contract of the 24th of January there was, upon the part of the defendant Schiffer, an intention to defraud.   Not an intention to defraud in the transaction of that date, but an intention to defraud thereafter, as explained by counsel, in future dealings with the property.   It is claimed by the counsel for the complainant that this intention was pursued and consummated by the sale to Forsch in March, the settlement in respect thereto of the 15th of June, the subsequent sale of all the complainant's remaining interest to Stern on the 17th of November, the settlement of that date with respect to the money advanced by the defendant Schiffer for working and developing the mine, and the subsequent and final settlement of August 1, 1882.   With respect to this proposition, we think it is sufficient to say that the

mere intent upon the part of the defendant Schiffer to defraud the complainant in some future transaction could not affect their contract of the 24th of January, which was otherwise unimpeachable.    These subsequent transactions which we have mentioned must stand, each upon its own merits.    If the complainant was defrauded by any one or all of them, it cannot operate to affect or invalidate a prior, independent contract made, entered into and executed for a good and valuable consideration.    A fraud must relate to facts then existing, or which had previously existed; hence non-performance of a promise made in the course of negotiations is not of itself either a fraud or the evidence of a fraud.    Cooley, Torts, 474–486. It is true, this rule does not obtain in a class of cases where the promise is the device resorted to to accomplish the fraud, as where one buys property, real or personal, with the existing intention not to pay for it.    Cooley, Torts, 487; *Dowd v. Tucker*, 41 Conn. 203; *Dow v. Sanborn*, 3 Allen, 182; *Richardson v. Adams*, 10 Yerg. 273; *Gross v. McKee*, 53 Miss. 538.    It is difficult to bring the case at bar within this class of cases.    The deferred payment of $2,000 was paid by Schiffer when due.    The subsequent wrongful demand to be released from the contingent payment of the $6,000, like a failure to pay, is not of itself evidence of an original fraudulent intent. Taken in connection with his entire conduct in his dealings with the plaintiff, it is perhaps cumulative evidence that the defendant was a hard and exacting dealer, but to treat it, even when thus supported, as evidence of an original fraudulent intent sufficient to invalidate the several contracts between the plaintiff and defendant of a year and eighteen months before, would be to place the validity of contracts and conveyances upon very uncertain grounds.    We are of the opinion, therefore, that the complainant is not entitled, as against the defendant Schiffer, to reconveyance of the one-half interest sold to him.    Still less is the complainant entitled to this relief

as against the defendants Forsch and Stern. There is no evidence to support the allegation of conspiracy between them and the defendant Schiffer, or to show that they were other than innocent and *bona fide* purchasers.

We now proceed to the consideration of the three several settlements made by the complainant and defendant, of the 15th of June and of the 17th of November, 1881, and of the 1st of August, 1882, with respect to which the complainant demands relief upon the ground that they were made under duress of goods. Contracts made and money paid under duress of goods have been held, the former void and the latter recoverable, in many well-considered cases both in England and America. The decisions are not uniform in their expression of the law, but they all rest upon the proposition that the duress of property was such as to render the contract or payment involuntary. It seems to be well settled that where a party has possession or control of the property of another, and refuses to surrender it to the control and use of the owner, except upon compliance with an unlawful demand, a contract made or money paid by the owner under such circumstances to emancipate the property is to be regarded as made under compulsion. The case of *Astley v. Reynolds*, 2 Strange, 915, is regarded as the leading English case. There a pawnbroker refused to deliver goods pawned, except upon payment of excessive interest. The owner having paid this to obtain possession of his property, he was allowed to recover back the excess. See, also, *Smith v. Bromley*, 2 Doug. 696. The refusal of common carriers to deliver goods without payment of excessive charges has given rise to numerous cases in which the principle has been applied. *Ashmole v. Wainwright*, 2 Q. B. 837; *Harmony v. Bingham*, 12 N. Y. 99; *Tutt v. Ide*, 3 Blatchf. 249; *Beckwith v. Frisbie*, 32 Vt. 559. The exaction of illegal taxes and tolls constitutes another class of cases in which recovery has been allowed upon the same principles. *Briggs v. Lewiston*, 29 Me.

472; *Grim v. School Dist.* 57 Pa. St. 433; *Preston v. Boston,* 12 Pick. 14; *Elliott v. Swartwout,* 10 Pet. 138; *Ripley v. Gelston,* 9 Johns. 201; *Chase v. Dwinal,* 7 Me. 134; *Manufacturing Co. v. Amesbury,* 17 Mass. 461. So, too, where the duress has been by means of legal process, money paid to release property so held is recoverable. *Spaids v. Barrett,* 57 Ill. 289; *Crawford v. Cato,* 22 Ga. 594; *Collins v. Westbury,* 2 Bay, 211; *Chandler v. Sanger,* 114 Mass. 364; *Bank v. Watkins,* 21 Mich. 483. Money wrongfully exacted by a corporation as a condition precedent to a transfer of stock was held recoverable in the case of *Bates v. Insurance Co.* 3 Johns. Cas. 238. Illegal commissions demanded and paid to secure the surrender of bonds were held recoverable in the case of *Scholey v. Mumford,* 60 N. Y. 498. Money paid in order to obtain a transfer of patents wrongfully withheld was held recoverable in the case of *White v. Heylman,* 34 Pa. St. 142. In the case of *Vyne v. Glenn,* 41 Mich. 112; 1 N. W. Rep. 997, the duress consisted in an unlawful interference by defendant between the plaintiff and other debtors, by means of which he had stopped the payment to plaintiff of sums due him from such other debtors. Mr. Greenleaf states the general doctrine thus: "Under this count [*indebitatus assumpsit*] the plaintiff may recover back money found to have been obtained from him by duress, extortion, imposition, or taking an undue advantage of his situation, or otherwise involuntarily and wrongfully paid, as by demand of illegal fees, or claims, tolls, duties, taxes, usury, and the like, where goods or the person were detained until the money has been paid." 2 Greenl. Ev. § 121. Mr. Cooley says: "Duress of goods consists in seizing by force, or withholding from the party entitled to it, the possession of personal property, and extorting something as the condition for its release, or in demanding and taking personal property under color of legal authority, which, in fact, is either void, or for some other reason does not justify the demand." Cooley,

Torts, 507. What shall constitute duress of goods, as a question of fact, is often difficult to determine, and in its determination we are constantly confronted with the maxim, *volenti non fit injuria* — "an injury cannot be done to a willing person." Or, as more pointedly put, "if a person consent to a wrong he cannot complain."

Counsel for complainant insist upon the application of the principle of duress of goods to the three several and separate transactions between the complainant and defendant, which we have mentioned under their respective dates. As to the settlement of June 15th, respecting the Forsch sale, the principle involved has no applicability. Schiffer, as the agent of Forsch, charging Adams with certain false representations, refused to pay him the contract price for the interest sold by Adams to Forsch, whether justly or not we need not inquire. Adams was entirely free to accept or reject the smaller sum offered by Schiffer by way of compromise. He says: "I wanted the money, and he would not pay more, and I took it rather than lose the sale." "Refusal on demand to pay a debt that is due, thereby forcing the creditor to receipt in full for only a partial payment, does not constitute duress, if the debtor has done nothing unlawful to cause the financial embarrassment which compelled him to submit to the extortion." *Hackley v. Headley*, 45 Mich. 576; 8 N. W. Rep. 511. The evidence discloses no ground for saying that Adams, at the time, was financially embarrassed in any special or extraordinary manner, or, if he was, that Schiffer was in any way the cause of his financial embarrassment.

Nor can the settlement of the 17th of November be regarded as made under duress of goods. It is true that Schiffer claimed that Adams should reimburse him, or secure to him what he claimed as Adams' share of the money expended in the development of the mine, and this doubtless with a view of inducing Adams to accept the $15,500 offered by Stern for Adams' remaining interest

in the mine. Schiffer was doubtless pushing him, but it was Adams' duty to resist if the demand made by Schiffer was unjust. He was entirely free to refuse, either to make the sale to Stern, or to secure Schiffer's claim upon the mine. Schiffer had no control or possession of Adams' property. The claim for reimbursement was made, according to Adams' testimony, pending negotiations for the sale to Stern, and with a view, as he says, of coercing a sale. Upon Adams refusing to make the sale to Stern for the sum offered, he says: "We figured up this thing that I owed him upon the expenses for work." Adams says he offered him security on the ores to be taken out of the mine, but Schiffer refused, and wanted security on Adams' remaining interest in the mine, in case he refused to sell to Stern. Rather than thus place himself in Schiffer's power, he says he sold for $15,500. It is true that Adams, in his testimony, says, "When he [Schiffer] came to pay me he said, 'I am going to take out what you owe me.' The deed was signed, and I could not help it." He does not say, however, that the deed had passed from his control or possession to that of Schiffer, or that he demanded its return from Schiffer, or that Schiffer refused to return it. Moreover, even on this state of facts, did they exist, the question would still remain as to the lawfulness or the unlawfulness of Schiffer's demand. But the gist of Adams' testimony is to the effect that he made the sale with the full understanding that Schiffer would demand reimbursement out of the proceeds of the sale of an amount "figured up" and ascertained before the sale. That he yielded to the pressure brought to bear by Schiffer because he needed the money is no ground for holding either the sale or the settlement void. Sales and compromises and contracts under stress of pecuniary needs are of daily occurrence, and if such stress is to affect their validity, "no one," in the language of Justice Cooley, "could well know when he would be safe in

dealing on the ordinary terms of negotiation with a party who professed to be in great need." *Hackley v. Headley*, 45 Mich. 577; 8 N. W. Rep. 511.

The evidence touching the settlement of the 1st of August following presents a much closer question. In the month of April preceding Adams had been notified by Schiffer that his checks against his deposit at the Rio Grande County Bank would not thereafter be honored until the matter of his son's claim of title to the mining property was settled. The bank appears to have been under the control of the defendant and his brother, Abraham Schiffer, under the firm name of H. Schiffer & Bro. Adams had, at the time, about $8,000 on deposit at the bank, subject to his check. After receiving this notice from defendant, upon application by Adams to the bank for his money, Abraham Schiffer told him he didn't dare to let him have it without the consent of his brother. The refusal to let Adams draw on his money at the bank was peremptory and absolute, except for "enough to live on." Thus the matter stood until the settlement of the 1st of August. In the meantime Adams had addressed himself to the matter of his son's claim of title to the mine, and had obtained a deed from his son to Schiffer, the consideration being $10,000, which was paid by the defendant. He had also obtained a deed from the administrator of the estate of his deceased wife, at Schiffer's request. With respect to this claim of title of the son of Adams there does not appear to be any foundation for the charge that father and son were acting in concert for the purpose of compelling defendant Schiffer to pay a further sum of money for the mine. The son seems to have been undutiful and beyond the control or influence of the father. Some time prior to 1874 the complainant had given the son what is called a bill of sale of the mine, and had taken back a power of attorney to himself, dated February 19, 1874, and recorded May 6, 1874. This power of attorney was afterwards revoked by the son, at what

date the record does not disclose. The bill of sale to the son was without consideration, and made for the purpose of putting the property beyond the reach of certain divorce proceedings instituted by the wife of Adams, but afterwards discontinued. There is nothing to show that it was a conveyance, either in form or effect. Schiffer had obtained an abstract of title from the county clerk's office prior to his purchase from Adams in January, 1881, and had full knowledge of its condition at the time of his purchase. His contract with Adams of the 24th of January, for the one-half interest, calls for a good and sufficient deed of conveyance, "passing to the said Schiffer a good and perfect title to the said above-described property." On the 15th of June following, after Adams had made his relocation and entry of the mine and mill-site, under the name of the "Aztec," Adams, in pursuance of this contract, conveyed to Schiffer the one-half interest by a deed of quitclaim, without covenants. Schiffer must be taken to have accepted this deed as a full compliance with and discharge of the contract of January 24th. Forsch's contract with Adams, of the 21st of March, for one-sixteenth interest in the mining property called for a "good warranty deed as soon as a duplicate receipt for patent is issued from the United States land office." On the 15th of June, Adams, in pursuance of his contract, conveyed to Forsch this one-sixteenth interest by deed of quitclaim, without covenants, and delivered it to Schiffer as Forsch's agent. This also must be taken as having been accepted in full discharge of his agreement of the 21st of March. The conveyance by Adams to Stern, under the date of November 17th, is by ordinary deed of quitclaim, but with the covenant added: "And the said party of the first part, for the consideration above stated, does hereby covenant and agree with the said party of the second part that he has full right and power to sell and convey the said premises, and that said premises are now free and clear from all incum-

brances, sale or mortgage made or suffered by the said party of the first part." These covenants were broken at the time of the conveyance, if broken at all. Will. Real Est. 413. The covenant of right to convey amounts to a covenant of seizin; they are synonymous. The principles and practice applicable to the one apply to the other. 3 Washb. Real Prop. 448; Will. Real Est. 415; *Rickert v. Snyder*, 9 Wend. 421. There was no breach of this covenant, as, at the time of the conveyance, Adams was in possession of the property conveyed, and had a right to convey, within the meaning of the covenant. 3 Washb. Real Prop. 449. Nor can we say that there was breach of the covenant against incumbrance and sale. An existing, outstanding, paramount title is held to constitute a breach of the covenant against incumbrances. 3 Washb. Real Prop. 461; *Cornell v. Jackson*, 3 Cush. 506. But the claim of title made by R. O. Adams does not appear to have been of any such substantial character. What is called a bill of sale to him from his father is not set forth in the record. So far as we can see, his claim was without any foundation in law. He does not appear to have ever been in possession of the mining property, nor to have taken any of the steps necessary under the law to perfect or preserve title. What little evidence we have on the subject goes to show that the property was subject to relocation by the complainant and that the title he gave was good. Afterwards Adams, on his own behalf, and as attorney in fact for his son, R. O. Adams, executed and delivered to Schiffer a quitclaim deed for the entire property. This deed is dated November 17, 1881, but is acknowledged February 14, 1882, and was made in compliance with a request of Schiffer, contained in his letter of January 22, 1882. He writes: "* * * I had abstracts sent east, but since I am here a party wishes also a quitclaim deed signed by you, as attorney for R. O. Adams, as it cleans up all interest or pretended interest in the former location. I

therefore inclose you quitclaim deed for you to sign. There is no value attached; only matter of form. * * * " This deed likewise is without covenants, and Adams testifies that Schiffer, at the time, knew that R. O. Adams had theretofore revoked his power of attorney to his father. Schiffer does not contradict this statement.

In view of the facts we do not see that Schiffer had any legal ground for his claim that Adams was bound to protect him and his associates, Forsch and Stern, against the claim of title made by the younger Adams. But whatever the rights of Schiffer under the several contracts and conveyances, he must be held to have waived them, if they existed. After much dispute in respect to the matter, Schiffer distinctly announced to Adams that he himself was willing to pay $10,000 for a quitclaim deed from his son. It was upon this reiterated proposition that Adams addressed himself to the work of securing his son's deed. He says in his testimony: "Mr. Schiffer said, 'If you accomplish a settlement, and he [the son] will give me a quitclaim deed, I will give him $10,000.' I said, 'I don't know anything more about that boy than you do. He has been nothing to me for four years; but I will do what I can.' * * * After he said he would help, I went to work with a determination to accomplish it. I never admitted the title of my son to Mr. Schiffer. I went to work negotiating with my son by letter and telegraph, and at last he agreed to relinquish all claims to Mr. Schiffer by giving a quitclaim deed for $10,000." There can be no doubt upon this point, accepting the testimony of the defendant Schiffer himself. In the postscript to his letter under date of June 16, 1882, he writes: "You certainly can't expect me to pay $10,000 without seeing the deeds and getting everything satisfactorily arranged, after agreeing to pay this sum without owing a cent for it; but I will not fail upon my word, and will pay for deeds satisfactory all around, so there will be no more hereafter. I want you

plainly to understand, if I agree to do anything I never fail, except by accident or death.  *  *  *"  "*Question.* What do you mean when you state in your letter — I have forgotten the date of it — that you would pay $10,000? Did you mean, when you said that, that Dr. Adams was to pay any part of that $10,000? *Answer.* I agreed to pay $10,000.  *Q.* Did you tell Dr. Adams at that time that he was to pay his proportion of that $10,000? *A.* I did not say so at that time.  *  *  * When I made the $10,000 proposition to Dr. Adams I authorized him to make the proposition to his son, and I said in case he brought it about I would pay $10,000. *Q.* When you made that proposition did you tell him in any way, shape or manner that he would be required to pay any part of that $10,000? *A.* I didn't.  *Q.* Did you not give him to understand that you would pay that $10,000 yourself for the sake of having the matter settled? *A.* Yes; I told him I would pay it to have the matter settled."  Again he says: "I told Mr. Adams then, in order to have this thing settled, the best I would do, and all I would do, was, I would give him $10,000, although I don't know your son, and I consider it your business to defend it."  After having obtained this deed from his son, and also a deed from the administrator of his deceased wife, Adams went to the bank of defendant on the 1st day of August, 1882, for the purpose of settlement.  Whether the defendant snatched the administrator's deed from the hand of the complainant or not is immaterial; he admits that he refused to return it to Adams, and took it and put it on record.  He then, for the first time, tells Adams that he was to reimburse him the $10,000 paid to the son.  He says: "I had it recorded, and then I went back to the bank and found Mr. Adams there, and Mr. Keyser [cashier] was there also.  I asked Mr. Keyser how much was due Mr. Adams.  Mr. Keyser looked up the books, and found between sixty-three and sixty-four hundred dollars,—$6,437.34.  I told Mr.

Adams I had an offset; 'I have an offset against you of $10,000 that I paid your son, which I had no business in the world to pay. It was for you to settle; it was a suit brought by your son against you, but you did not do anything towards it. I had to bear it, and I want you to stand it.' * * * He wouldn't submit to it. I says, 'I will tell you what I will do, and that is all I will do; if you stand $2,500 out of this ten thousand, and release me from the payment of the six thousand I was to pay you according to our contract at any time I should sell the property for $40,000, or my half for $20,000, we will settle right here.' I says, 'If you ain't satisfied with that you can sue, but that is the best I will do.' He asked me to put it down on a piece of paper what I was willing to pay. I says, 'All right, it is in black and white; we have some $6,400 due you; you take off $2,500, which will leave a balance of thirty-nine hundred and some odd dollars, and you discharge me from paying that six thousand.' It was all on a piece of paper, and I think he took that paper. He says, 'Is that the best you will do?' and I said, 'Yes.' He said, 'I will see you later,' and left the bank. * * * Some time about 2 o'clock Mr. Adams came back to the office and says, 'Now, Herman, let us settle this matter; I have had enough of this trouble; I want my money.' I told him that his money was ready. He looked at the paper he had and said, 'Now, can't you make this an even sum of $4,000.' I says, 'No, I can't; but if you want to accept this you can do so.' He studied awhile and said, 'I suppose I am satisfied with it.' * * * I went out and called Mr. Wilson, and told him that we had settled. * * * Mr. Wilson went out, and in an hour or so came back and brought the papers to the office, and read us the settlement papers. * * * Mr. Wilson read both of them to Adams. Adams made no objection; he signed them. I gave him a receipt in full, and he accepted it. That

finished everything, except some small accounts, which were not settled in that."

The refusal of Schiffer to allow Adams to draw on his money in bank, his agreement to pay $10,000 for his son's deed, his subsequent refusal to pay it after getting the deed in his possession, and the demand that Adams should pay it, was a clear attempt to perpetrate an unmitigated fraud. Adams did not admit any title in his son, or, if it existed, that he was called upon to defend it; nor is it to be presumed that he ever would have submitted to the final demand made by Schiffer but for the control which Schiffer had over his money on deposit with the firm of H. Schiffer & Brother. Money deposited with a banker by a customer in the ordinary way is money lent to the bank, with the superadded obligation that it is to be paid when demanded by check. Ball, Banks, 83. The money deposited by Adams, and withheld from him, was due him, not from the defendant Herman Schiffer, but from the banking firm of H. Schiffer & Brother. The defendant's control and influence in the business matters of the firm were such as to control the firm in its action in this matter. It was, therefore, not a mere withholding of a debt due from himself, but an unlawful interference between the plaintiff and other debtors, by means of which he stopped the payment to plaintiff of sums due him; and presents a case analogous to that of *Vyne v. Glenn,* 41 Mich. 112; 1 N. W. Rep. 997, reviewed by Mr. Justice Cooley in the case of *Hackley v. Headley,* 45 Mich. 577; 8 N. W. Rep. 511. We are of the opinion that the settlement of the 1st of August was clearly made under duress of property, and must be held null and void.

The court erred in dismissing the bill. The views expressed preclude a recovery in respect to the matters embraced in the settlements of the 15th of June and the 17th of November. Upon some, if not all, of the remain-

ing issues made by the pleadings, we are of the opinion that both complainant and defendant should have an opportunity to introduce further evidence, if they should be so advised. We do not, therefore, direct a decree, but remand the cause for further proceedings. The decree of the court below is reversed.

*Reversed.*